UNITED STATES *v.* RIETMANN PILCER Co. (D. ARDITI), LUNHAM & REEVE (D. ARDITI) (No. 3981)[1]

[1] T. D. 48830.

United States Court of Customs and Patent Appeals, January 25, 1937

*Joseph R. Jackson,* Assistant Attorney General (*Charles D. Lawrence,* Special Assistant to the Attorney General, and *John J. McDermott,* special attorney, of counsel), for the United States.

*Allan R. Brown* and *Fred J. Carter* (*E. F. Blauvelt* of counsel) for appellees.

[Oral argument October 12, 1936, by Mr. Lawrence and Mr. Blauvelt]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

The Government has here appealed from the judgment of the United States Customs Court, First Division, sustaining four protests of importers against the classification and duty assessment by the Collector of Customs at the port of New York of certain rugs imported from France. In the aggregate the protests cover eleven different entries. The cases were consolidated for the purposes of trial.

The merchandise was classified and duty assessed at 40 per centum ad valorem, under paragraph 1117 (a) of the Tariff Act of 1930, reading:

PAR. 1117. (a) Axminster carpets, rugs, and mats, not specially provided for; Wilton carpets, rugs, and mats; Brussels carpets, rugs, and mats; velvet or tapestry carpets, rugs, and mats; and carpets, rugs, and mats, of like character or description; all the foregoing, valued at not more than 40 cents per square foot, 40 per centum ad valorem; valued at more than 40 cents per square foot, 60 per centum ad valorem.

The claim of the importers sustained by the trial court, one judge dissenting, is that the merchandise is properly classifiable under paragraph 1117 (c) of the Tariff Act of 1930, with duty assessment at 30 per centum ad valorem. The paragraph reads:

(c) All other floor coverings, including mats and druggets, wholly or in chief value of wool, not specially provided for, valued at not more than 40 cents per square foot, 30 per centum ad valorem; valued at more than 40 cents per square foot, 60 per centum ad valorem.

The importers called as a witness the examiner of merchandise who stated that he made the advisory classification of the rugs at issue. He testified that he knew what the merchandise included in the invoices was, and identified a sample as being representative, except

for size, of all the rugs involved. This sample was introduced and is in evidence as Exhibit 1. Also, he testified that Exhibit 1 is in chief value of wool, and the whole tenor of the testimony of the two other witnesses, subsequently called, one on behalf of the importers and one on behalf of the Government, is to the effect that the representative sample is not an actual Wilton rug.

So, as the case is presented here, the issue is limited to the inquiry of whether the rugs are rugs of "like character or description" to Wiltons. If they are, they are more specifically provided for in paragraph 1117 (a), *supra*, than as "All other floor coverings" under paragraph 1117 (c), *supra*. If they are not of such "like character or description", then no question is raised as to their being classifiable as importers claim.

Obviously, our first concern is with determining what a Wilton rug is.

The New Standard Dictionary defines "Wilton", when applied to carpets or rugs, as "A cut-pile Brussels carpet or rug first manufactured in the English town of Wilton", and Webster's New International Dictionary as "A kind of carpet or rug woven with loops like the Brussels, but differing from it in having the loops cut, forming an elastic velvet pile; so called because made first at Wilton, Eng."

In the Summary of Tariff Information, 1929, Vol. 2, page 1734, prepared for the use of Congress in formulating the Tariff Act of 1930, is found the following, referring to paragraph 1117 of the Tariff Act of 1922, predecessor of paragraph 1117 of the Tariff Act of 1930:

*Description and uses.*—The carpets and rugs covered by this paragraph may be divided into four classes.

    \*        \*        \*        \*        \*        \*

(2) Wilton, Brussels, velvet, and tapestry carpets form a distinct class, being warp-pile fabrics having a foundation made with warp and filling and a surface made of an extra set of warp threads woven over wires.

The Wilton is a cut-pile fabric and the better varieties rank among the highest examples of machine-made floor coverings. The warp is usually of cotton and the weft yarns of either cotton or jute. The extra warp threads to form the piles are drawn from superimposed frames of spools at the back of the loom, the spools in each frame usually being of a single color. The fabric is known as a "five-frame" or "six-frame" Wilton; the larger the number of frames the greater the variation of color and design obtainable. These pile-warp threads may be either woolen or worsted yarn. The term Saxony usually signifies a Wilton made with woolen pile yarns.

The Brussels is a loop (uncut) pile fabric, durable and of high quality. It is made in much the same manner as the Wilton, drawing the dyed warp-pile yarns from frames of spools at the back of the loom, but differing in construction in certain details. The pile is always worsted yarn; the warp is of jute, and the weft yarns of linen or jute; sometimes jute stuffer threads are inserted to give greater bulk and weight to the fabric.

Velvet (sometimes known as tapestry velvet) is a cut-pile fabric made in imitation of the Wilton but cheaper and less durable. Instead of a design formed from dyed warp-pile yarns, the pattern is printed on the pile warp. As this printed

pile is used only for the surface there is a smaller proportion of wool and a larger proportion of jute and cotton than is the case in Wiltons, in which the dyed pile when not used to form pile is buried in the body of the fabric.

Tapestry (sometimes known as tapestry Brussels) is a loop (uncut) pile fabric made in imitation of the Brussels. The pattern is printed on the warp and this, as for velvet, permits a greater economy of wool; the fabric produced is cheaper but less durable than the Brussels.

It will be observed from the foregoing that Wilton, Brussels, velvet, and tapestry carpets (and we understand what is said to apply in the same way to *rugs* of those types) constitute a distinct class, the general distinguishing characteristics of which class, as we understand the statement, being that the articles are warp-pile fabrics having (1) a foundation made with warp and filling and (2) a surface made of an extra set of warp threads which latter are woven over wires.

The details of constructing or weaving each of the four types included within the class are then stated, or outlined, in the Summary, and from this it seems that the differences between the types (except as to variations in the values and proportions of material and the formation of certain design patterns by printing instead of by the use of dyed warps in the case of velvet and tapestry articles) result from the differences in the processes of construction—that is, the methods of weaving—plus, in the case of the Wiltons and the velvets, the cutting of the extra warp threads composing the surface which make those rugs cut-pile fabrics, thereby distinguishing them from the loop (uncut) fabrics designated, respectively, as Brussels and tapestry rugs.

Bearing in mind the dictionary definitions and the statements of the Summary, we turn to the testimony in the case respecting the manner of weaving Wilton rugs and rugs such as Exhibit 1, and other related matters.

Upon these questions the importers called as a witness Mr. Jno. D. Harris, and the Government, Mr. Henry I. Magee.

Mr. Harris testified in substance that he was a jobber and importer of floor coverings; that he had been for twenty-five years in the floor covering business; that he had dealt in various kinds of rugs, including rugs such as Exhibit 1; that he had visited factories in the United States where he had seen Wilton rugs woven, and had also visited factories in Italy, Belgium, and France where, in the years 1931 and 1932, he had witnessed the weaving of rugs such as Exhibit 1, having visited at least some of those factories for that express purpose, as well as for the purpose of making purchases. He seems also to have had a factory. At least at one place he states: "I had my own factory making Wilton rugs."

Mr. Magee testified in substance that for thirty-five years he had been connected with a firm at Philadelphia which produces rugs and

carpets; that he was vice-president and general manager of the firm; that for approximately twenty-five years he had supervised the manufacture of rugs; that the firm produced Wilton rugs and carpets, and also rugs like Exhibit 1; that he was perfectly familiar with the weaves of other carpets as well, and that he had seen rugs like Exhibit 1 woven in Germany "seven or eight years ago." He testified in greater detail than did Mr. Harris respecting the methods of weaving different types of rugs, and his testimony in this respect harmonizes with the descriptions given in the Summary, *supra.*

We think from the testimony that both witnesses were very well qualified by training, observation, and experience to give evidence upon the matters concerning which they were interrogated, and, when their testimony is carefully analyzed, we fail to find any material conflict between them upon any questions of actual fact, although they seemingly differed upon some matters of conclusion

There is a suggestion that there was a conflict with respect to whether rugs like Exhibit 1 are woven on Wilton looms, but we do not find it so. The purport of Harris' rather meager testimony upon this point seems to be that he had not seen such rugs woven on a Wilton loom, while as we understand the testimony of Magee, his firm did use the Wilton loom in weaving such rugs, although this is not altogether clear. Assuming it to be so, however, it does not follow that their statements on this point are in conflict.

Both agree that rugs like Exhibit 1, as well as actual Wiltons, are woven on power looms having Jacquard attachments for the creation of the designs, and it may here be said that it is stipulated by counsel that "several types of rugs, other than Wilton rugs, are woven on looms with a Jacquard attachment." Also both witnesses agree that there is an actual difference in weaving a Wilton rug and a rug like Exhibit 1, in that in weaving a Wilton, one rug is woven at a time, the extra warp threads for forming the pile being woven over wires which when withdrawn cut the threads, so making the cut-pile, while rugs like Exhibit 1 are woven double, or two at a time, face to face, and the extra warp threads are cut with a knife as the weaving progresses. So far as the actual manufacturing process is concerned, this seems to constitute the only difference. The witness Magee said of Exhibit 1:

It is similar and identical to a Wilton rug in every particular except the one in which it has not been woven—that is, the pile has not been thrown over a wire with a knife.

As to the result in the nature or structure of the product obtained by this different weaving, there is also agreement generally in the testimony of the two witnesses. Both agree that in general the rugs like Exhibit 1 are imitation oriental rugs and that they are sold as such, not as Wiltons. When sold they seem to be given trade names. The

witness Harris stated of Exhibit 1, "I would call this Harajah", and the witness Magee said, "We make two qualities of rugs of this type. One is known as Shirvana, and the other is known as Kabistan." Mr. Magee further testified upon cross-examination that the advantage "to us" in weaving merchandise like Exhibit 1, in the manner his firm does, "is two-fold" in that "We are enabled to get a soft-back rug", and "we can put a design on the back of the rug, and thus duplicate, or imitate an oriental rug." In answer to the question, "You never sell Exhibit 1 as a Wilton, do you?", he replied, "No; there would be no sense to it", and, upon redirect examination, gave as the reason for the latter statement:

—A. Because in this particular type of rug the main object is to duplicate in appearance as near as possible an oriental rug. The fact of labeling it a Wilton, or labeling it anything else, would have no particular sales value. The main object is to have it look like an oriental rug. We do put on a label to assure the trade that this has all the characteristics.

Just what was meant by "characteristics", as there used, is not clear. It is noted that he had previously testified that in offering his firm's rugs like Exhibit 1 for sale, "We have a silk label which is pasted right on the end of the rug, on which is one of our advertising slogans, 'Woven the Wilton Way'", but whether by "characteristics", as used above, the witness meant characteristics of a Wilton, or characteristics of Exhibit 1, or characteristics of imitation orientals, as which latter his firm's rugs were offered for sale, does not appear.

The witness Harris testified that Exhibit 1 does not wear as well as a Wilton rug, and when asked as to what feature of Exhibit 1 "to your mind, explains that fact", answered:

\* \* \* The feature is that in exhibit 1 all the wool which went into the manufacture of this rug is on the surface, whereas in the construction of a Wilton rug wools which do not appear on the surface are also embodied in the body of the rug.

  \*    \*    \*    \*    \*    \*    \*

Let's see if I can explain it to you by using exhibit 1. Here we see a color, red, or we see a color, black. This red on a Wilton rug would appear underneath the black and not show on the surface. The same would apply to every color.

The witness Magee said:

The distinguishing feature of the Wilton weave is that in a Wilton weave, from the very processes that I have described, out of all the mass of yarn behind the loom or in the harness, you can only get up to the surface at any given pick in the loom, about one-fifth or one-sixth, whether you are working with a 5-frame or 6-frame; but you can only get one-fifth or one-sixth of the number of threads up on the surface. The balance of the threads will always be found running along the back of the carpet. That is the distinguishing characteristic of a Wilton weave. In no other weave will you find it just that way. \* \* \*

Also, Mr. Harris testified that he had purchased Wilton rugs and rugs like Exhibit 1, "at one and the same time", and stated, "Wilton rugs cost at least twice as much as exhibit 1 from the same factory."

It seems proper to say, in this connection, that there was no statement as to the qualities of the materials entering into the rugs, the prices of which were so compared, but the witness did say that the method employed in weaving a Wilton rug, as he had described it, required "the use of more costly materials than are employed in weaving exhibit 1."

The witness Magee was interrogated during cross-examination upon the wearing qualities of Wilton rugs and rugs like Exhibit 1, and explained his inability to answer the questions as framed, the explanation being, in part, that "you can make Wilton rugs of the cheapest kind of wool yarn, * * * and you can make exhibit 1 rugs of the finest yarn, of the finest kind of worsted yarn * * *." Upon the question of price, Mr. Magee said that *his firm's* standard line of Exhibit 1, "Is higher in price * * * than a Wilton rug of somewhere near the kind of yarn; and the number of wires to the inch", but added that they did manufacture Wiltons of better material, etc., "costlier than rugs which we make of exhibit 1." His testimony on this particular point was confined to the practices of his own firm.

We do not find in the testimony of Mr. Magee anything which contradicts the statement of Mr. Harris to the effect that all the wool which went into the manufacture of Exhibit 1 is on the surface while in Wiltons the wools which do not appear on the surface "are also embodied in the body of the rug", unless his testimony as to the manner of weaving Exhibit 1 being the same as that of weaving a Wilton (with the exception already herein described) be so construed, and since that particular testimony related purely to the mechanics of the manufacturing process, we do not so construe it.

The phrase "of like character or description" while clear enough in meaning as it is commonly used, is nevertheless difficult of judicial construction, or at least of application, when taken, as it must be, in connection with the articles here being compared. It has appeared in the carpet and rug paragraphs of various tariff acts, extending at least as far back as the 1909 act, but seems never to have been judicially construed. In the case of *United States v. Marshall Field & Co.*, 18 C. C. P. A. (Customs) 403, T. D. 44642, there was involved the classification, under the Tariff Act of 1922, of certain rugs claimed by the Government to be of like character or description to Wilton rugs. They had been assessed by the collector as "similar" to Wilton rugs. We there pointed out that Congress did not use the term "similar" and said "* * * we can not give to the term 'of like character or description' a meaning exactly the same as 'similar'." To that extent we there construed the phrase negatively, of course comparing "similar" with the entire phrase "of like character or description."

In the case at bar the original brief on behalf of the Government, says:

We contend that the only accurate and reasonable way to determine whether or not a rug is of "like character or description" to a Wilton rug is to examine the nature of the respective weaving processes and the types of looms employed in the manufacture of the said rugs.

The brief on behalf of the importers, while not relying solely upon the difference in the process of manufacture to determine the issue, does seem to lay great emphasis upon that element, and in this connection asserts that, "The distinguishing characteristic of the rugs *eo nomine* provided for in paragraph 1117 (a) is the method of weaving." The brief continues:

As the court knows of its own knowledge all rugs are more or less similar in that (1) they are used as floor coverings, (2) they are woven textiles, (3) many of them are of pile construction, and (4) most of them are made of wool and other materials. The distinguishing characteristic is and has always been the method of manufacture or weaving.

Both of the judges of the trial court who joined in sustaining the protests wrote opinions. The leading opinion, which was by Brown, J., reviews the testimony and, referring to the witness Magee, says:

* * * Witness testified, however, that this different method of producing the pile results in a finished rug with a soft back and which in the color scheme simulates an Oriental rug and that rugs such as Exhibit 1 are never sold as Wilton rugs but as imitation Oriental rugs.

This last we believe goes to the heart of the controversy here. However similar the looms employed, however identical the method of employing the Jacquard attachment to form the design, and however similar or identical the mechanics of the weaving process, the fact remains that in the one case there is produced a Wilton rug and in the other a rug such as Exhibit 1 which is never sold as a Wilton rug, but under various private trade names is sold as an imitation Oriental rug which is something totally different from a Wilton rug.

The concurring opinion of Sullivan, J., *inter alia*, says:

The testimony is conclusive that it was never sold as a Wilton rug; and that, as testified by the witness Magee, it was sold as an imitation Oriental rug. Therefore, it was not of like character or description to the rugs mentioned in paragraph 1117 (a). * * *

The foregoing excerpts, standing alone, would seem strongly to indicate that in the opinion of the majority judges the manner in which the rugs are sold, or the names under which they are sold, is decisive of the issue.

We are unable to agree that the fact the rugs at issue are sold as imitation orientals, or the fact that they may simulate oriental rugs in appearance, may be taken as conclusive that they are not of like character or description to Wiltons. In the *Marshall Field & Co.* case, *supra*, it was pointed out that real Wilton rugs often simulate oriental rugs in appearance. Neither are we able to agree that the

method of manufacture alone may be taken as decisive of the issue, and the same may be said as to the type of loom used in the weaving process.

If only the process of manufacture be looked to, and it be held that, in order to render a rug "of like character or description" to a Wilton, such rug must, in every particular, be made just as a Wilton is made, then (assuming the method of manufacture to be the sole test) the words "of like character or description" would be unnecessary, because the product would be an actual Wilton and classifiable as such for tariff purposes. Also, if all rugs woven on Wilton looms must be held to be actual Wiltons, then, were it proved that the rugs at issue were woven on such looms (which fact, as has been indicated, is not proved here), it would necessarily follow that they would be classifiable simply as Wiltons, and not as rugs "of like character or description" to Wiltons.

We have given careful thought to the suggestion on behalf of importers, quoted above, to the effect that the method of weaving is the distinguishing characteristic of the rugs *eo nomine* provided for in paragraph 1117(a), *supra*. It seems to be true that there is a decided difference between the methods of weaving Axminsters (even such as are machine woven), described in the first class in the Summary of Tariff Information above alluded to, and the Wiltons and others described in the second class. But as between Wiltons and velvets, upon the one hand, and Brussels and tapestries, upon the other (all in the second class), the difference seems to be not so much in the processes of weaving, although there are some differences, but in the character of the pile, the Wiltons and velvets having the pile cut and the others having the pile looped and uncut. So, it is not thought that the analogy which counsel for importers seek to draw is apt here.

In a supplemental brief filed on behalf of the Government, our attention is directed to the case of *Greenleaf* v. *Goodrich*, 101 U. S. 278, and that of *Schmieder* v. *Barney*, 113 U. S. 645. These cases arose under the tariff act of 1862, which contained a provision for duty "on all delaines, cashmere delaines, muslin delaines, barege delaines, composed wholly or in part of worsted, wool, mohair, or goat's hair, and on all goods *of similar description*, * * *." [Italics ours.]

It appears from the decision in the *Greenleaf* v. *Goodrich* case, *supra*, that the imported articles there at issue—                 ,

* * * were known in trade and were bought and sold as poil de chevres, reps plaids, lustres, Saxony dress-goods. They were always woven in colors, the yarns being dyed or colored before weaving. They never existed in the gray or uncolored condition. But they were made, as delaines are made, with a cotton warp and a worsted weft, the difference between them and delaines (as stated in the plaintiffs' protest) being that delaines are a fabric of all-wool, or cotton warp and worsted weft, and made of yarns not dyed, the cloth being printed or dyed in the piece. It further appeared that as early as 1857 both the all-wool de-

laines and those with cotton warp and wool or worsted filling were known in trade by names changed from time to time, to suit the fancy of importers and purchasers. It also appeared that in several other particulars the goods of the plaintiffs differed from delaines. * * *.

The suit by the importers to recover the duties paid under protest was brought in the Circuit Court of the United States for the District of Massachusetts and was tried with a jury. The trial court charged the jury respecting the expression, "goods of similar description", that "These words are to be taken and understood in their popular and received import, as generally understood in the community at large and at the time of the passage of the act", and, after calling attention to all the alleged dissimilarities urged by the plaintiffs, including the fact that delaines were woven in the gray while plaintiffs' goods were not, summed up as follows:

If you find that the product or result is an article for ladies' dresses made with a cotton warp and worsted filling, the question for your determination is, whether the two kinds of goods are substantially the same and alike. The process of manufacture, the worsted in the goods of the plaintiffs being dyed previous to weaving, is an element to be considered by the jury in coming to their conclusion, but not alone and distinct from all others which may have been established. It is for the jury to determine, from all the evidence in the case, whether, by the colored filling made and woven in the way and manner described with a cotton warp, the product is or not an article substantially similar and like the delaine fabrics, whether or not, while varying more or less in some particulars from delaines, the goods were or not substantially the same or substantially different from them. If substantially the same article, then the duties were properly assessed; but if they were substantially different, and the plaintiffs' goods were not of a similar description to the delaine fabrics, then they were not subjected to the additional duty.

The Supreme Court approved the charge of the lower court, saying at one point in its decision:

Composed, as the goods were, of the same materials as delaines, having a similar general appearance, and intended for the same uses, they might well have been of similar description with colored delaines, though there were differences in the process of manufacture.

The statute does not contemplate that goods classed under the words "of similar description" shall be in all respects the same. If it did, these words would be unnecessary. They were intended to embrace goods like, but not identical with, delaines.

In the *Schmieder* v. *Barney* case, *supra*, where "Saxony dress-goods" were involved, the pertinent matter for quotation is that where, referring to the *Greenleaf* v. *Goodrich* case, *supra*, the Supreme Court said:

It was there decided that if they [the delaines] were similar in product, in adaptation to uses, and in uses, they were of similar description, even though in commerce they might be classed as different articles. Upon that question the decision in *Greenleaf* v. *Goodrich* must be taken as conclusive.

No question of commercial designation was involved in either of the above Supreme Court decisions and none is involved in the case at bar. It, therefore, seems proper to say of the expression, "of like character or description", as was said in the *Greenleaf* v. *Goodrich* case, *supra*, of the expression "of similar description" that the words "are to be taken and understood in their popular and received import, as generally understood in the community at large and at the time of the passage of the act."

When so considered, it seems to us that the generally understood common meaning and popular and received import of the phrase "of like character or description", as used in paragraph 1117 (a), *supra*, differs little, if any, from the meaning of the phrase "of similar description", as used in the tariff act of 1862. It seems to us that the word "like", as used in the paragraph, has the same meaning as "similar", as used in the 1862 act, and that the word "character" is practically synonymous with the word "description." However that may be, the conjunction used is "or." So, even if "character" and "description" be given different meanings, if the rugs fall within either term, the rule as stated in the *Greenleaf* v. *Goodrich* case, *supra*, is applicable, and this is true even though there be a distinction in meaning, as we think there is, between the phrase "of like character or description", as used in the carpet and rug paragraphs, and "similar merchandise", as used in the statutes defining values for appraisement purposes, which was the thought we had in mind in our decision in the *Marshall Field & Co.* case, *supra*. When that rule is applied, obviously a number of elements must be considered in deciding the issue, including, as we understand the decision of the Supreme Court taken as a whole, structural features (in determining which the processes of manufacture may be looked to for aid), use, materials, and appearance.

It has been seen that the only actual distinction in the structure of the finished rugs here at issue and Wilton rugs is that in the former all the wool which went into the rugs is on the surface while in Wiltons only a part of the wool appears on the surface, the remainder being "embodied in the body of the rug." That this difference in structure may result in some difference in appearance may be conceded, but, as has been indicated, if the articles were required to be identical in all respects, then the provision for "rugs * * * of like character and description" to Wiltons would be unnecessary. They would be Wiltons.

If the articles here involved are not of like character or description to Wiltons, we confess our inability to conceive of any that would be except those identical in all respects.

Under this view of the case, we feel constrained to hold that the trial court reached a wrong conclusion.

It has been suggested, during our consideration of the case, that to be included within paragraph 1117 (a) under the expression "of like

character or description" it is not necessary that the rug be like any one of the particular rugs *eo nomine* provided for therein, but that it might partake of the qualities of all of them or some of them and if there were not too many differences, it would be "of like character or description" to the rugs provided for. In other words, the suggestion is that the imported rugs may properly be compared with the entire class of rugs named, and the *Marshall Field & Co.* case, *supra*, is referred to in this connection.

The instant case, however, was not presented upon that theory either in the trial court or here, but has been presented solely upon the issue of whether the rugs are of like character or description to the one particular kind known as Wiltons, and, in view of our conclusion that they are of such like character or description, it is unnecessary that we go beyond that question in determining the controversy.

The judgment of the United States Customs Court is *reversed*.

### CONCURRING OPINION

BLAND, Judge: I concur with the majority in holding that the imported rugs involved are "of like character or description" to Wilton rugs.

Regardless of the action of the collector in finding that they were similar to Wilton rugs, and regardless of the narrowness of the issue as it was presented to the court below, it is my view, and it may be the view of the majority, although it is not expressed, that in determining whether or not the rugs were properly assessed under paragraph 1117 (a), this court or the trial court should not be confined to considering likenesses or differences between the imported articles and Wilton rugs alone. Congress meant to include within the said paragraph any rug *which belonged to the class of rugs specifically named*.

By reason of the narrowness of the issue to which the majority confined itself, the opinion does not quote the first paragraph of the Summary of Tariff Information with respect to Axminster rugs, which reads as follows:

(1) Axminster carpets and rugs, not specially provided for, signifies Axminsters other than the handmade ("real") Axminsters and the chenille Axminsters. The machine-made Axminsters here covered are sometimes known as "spool" Axminsters, a term derived from the fact that the pile yarns are, in weaving, drawn from wide spools, each spool being as wide as the loom. The spool Axminster, *is an imitation of the oriental weave*, in that the pile threads are drawn from outside the warp and not formed from the warp. * * *. [Italics mine.]

I also wish to point out that if the issue was to be confined to a consideration of the imported rugs and Wilton rugs, pertinent and proper information concerning the character of Wilton rugs is to be

found in Tariff Information Surveys (Volume K–6). I quote as follows:

> The manufacture of Wilton carpet, like that of Brussels, is handicapped by the limitation in the number of different colors which can be used in the production of a single piece of goods. Nor can it rival the Axminster and chenille Axminster in the height of pile. However, Wilton makers have generally abandoned the attempt to secure a heavy pile, and by the execution of fine, delicate designs of carefully chosen colors, in a close-clipped fabric, *seem to imitate some of the best oriental fabrics.* The better varieties of these products are beautiful carpetings, and by some people are considered the best examples of machine-made floor coverings. [Italics mine.]

As to what Congress was trying to do by the use of the term "of like character or description", the report of the House Committee on Ways and Means contains pertinent language which does not require explanation or discussion and reads:

> Paragraph 1117: This paragraph relates to *machine-made carpets and rugs.* The rates of duty proposed by the committee remain the same as those in the act of 1922 except on Axminster, Wilton, Brussels, and velvet and tapestry carpets and rugs that are valued at more than 40 cents per square foot. The proposed duty on them is an increase from 40 percent ad valorem to 60 percent ad valorem. *The carpet industry, here and abroad, has recently developed a new type of high-grade rug. These rugs, as yet unnamed, are technically similar to Wiltons and are practically the only rugs that will fall under the 60 percent rate.* [Italics mine.]

I am writing this specially concurring opinion chiefly for the purpose of pointing out that the collector in classifying rugs under this paragraph is not required to state that the imported rugs are of like character or description to any one particular rug. It seems reasonable to conclude that if some Wilton rugs did not simulate an oriental rug, the majority might have regarded the differences between the imported rugs and Wilton rugs to be sufficient to warrant a holding that they were not dutiable under the paragraph, notwithstanding the fact that spool Axminster rugs which are provided for in the paragraph are always imitations of oriental weaves. I could not have agreed with this conclusion.